SCHMUDE OIL, INC v DEPARTMENT OF ENVIRONMENTAL
QUALITY

Docket No. 313475. Submitted June 11, 2014, at Lansing. Decided July 1,
2014, at 9:00 a.m.

Schmude Oil, Inc, Wellmaster Exploration and Production Co, LLC,
and Dennis Schmude sought review in the Ingham Circuit Court of
a decision by the Department of Environmental Quality (DEQ),
which had denied 9 of petitioners' 11 applications for permits to
drill and operate wells, including a brine-disposal well, within the
Pigeon River Country State Forest (PRCSF). In the 1970s, the
Michigan Department of Natural Resources developed a formal
plan to manage the hydrocarbon resources in the PRCSF. The plan
was incorporated into a consent order between the state and the
oil companies that held the bulk of the mineral rights in the area.
Continuing litigation, however, led to negotiations between envi-
ronmental groups, oil companies, and the state, which resulted in
the Amended Stipulation and Consent Order (ASCO), which
governs oil and gas development in the PRCSF. Petitioners'
proposed well sites were located on the Song of the Morning
Ranch, a privately owned 806-acre parcel located within the
PRCSF. The court, William E. Collette, J., affirmed the decision of
the DEQ, denying petitioners' permit applications. Petitioners
appealed by leave granted.

The Court of Appeals *held*:

1. Part 619 of the Natural Resources and Environmental
Protection Act (NREPA), MCL 324.61901 *et seq.*, clearly and
unambiguously adopts and incorporates the provisions of the
ASCO. The ASCO designates a certain portion of the PRCSF as a
nondevelopment region. The nondevelopment region includes all
lands within the PRCSF designated as geographic Units II, III, and
IV on a map in Appendix A of the ASCO. Because the ASCO uses
the term "all," in defining the PRCSF land in the nondevelopment
region, the nondevelopment region includes both public and pri-
vate lands. Eight of petitioners' permit applications concerned
property within the nondevelopment region. Therefore, the DEQ
was required to deny those eight permit applications even though
they concerned private land. Contrary to petitioners' assertions,

even if other parts of NREPA are read *in pari materia* with Part 619, there is no express policy in NREPA favoring drilling. A reading of NREPA as a whole demonstrates that oil and gas production is favored only when it is environmentally prudent and does not have a negative effect on other valuable natural resources.

2. The ASCO states that all land within Unit I of the PRCSF is a limited development region. Under the ASCO, no well sites may be placed within ¼ mile of surface water in the limited development region. In this case, the DEQ denied one of petitioners' permit applications because the application sought a permit to drill within ¼ mile of water in the limited development region. The plain language of the ASCO, which was adopted by and incorporated into Part 619 of NREPA, required the DEQ to deny the permit application.

3. The federal and state Constitutions proscribe the taking of private property for public use without just compensation. For a categorical taking to exist, there must be a denial of all economically beneficial or productive use of the land. When governmental action diminishes, but does not completely deprive the land of all value, the landowner cannot establish a categorical taking. Petitioners could not establish a categorical taking because the denial of their applications for permits did not completely deny petitioners of all economically beneficial or productive use of their oil and gas leases because petitioners could still operate wells in the limited development region and they could use horizontal drilling at other well locations. Regulatory-taking claims that do not rise to the level of a categorical taking are governed by the standard set out in *Penn Central Transp Co v New York City*, 438 US 104 (1978), which focuses on (1) the character of the government's action, (2) the economic effect of the regulation on the property, and (3) the extent by which the regulation has interfered with distinct, investment-backed expectations. In this case, the prohibition on drilling in the nondevelopment area did not single out petitioners to bear the burden for the public good. Instead it was a comprehensive scheme that applied to all landowners within the nondevelopment region. Further, although the outright prohibition of drilling or the required use of horizontal drilling would have a negative effect on petitioners' oil and gas leases, petitioners were not without some value in the leases. And petitioners had notice of the regulations at the time that they acquired their interests in the property. Given these facts, petitioners also failed to establish a regulatory taking.

4. The constitutional guarantee of equal protection ensures that people similarly situated will be treated alike, but it does not

guarantee that people in different circumstances will be treated the same. To be considered similarly situated, the challenger and his comparators must be prima facie identical in all relevant respects or directly comparable in all material respects. In this case, petitioners took umbrage with the fact that the ASCO divides the PRCSF into different development regions, but failed to argue that landowners in the nondevelopment regions were similarly situated to landowners in other regions of the PRCSF where drilling is permitted. But, even if the land in the nondevelopment region were similarly situated to the land in the limited development region, the classification meets the rational-basis test because it can be assumed that the different development regions faced different environmental concerns.

Affirmed.

ENVIRONMENT — MINES AND MINERALS — OIL AND GAS DEVELOPMENT — PIGEON RIVER COUNTRY STATE FOREST.

Part 619 of the Natural Resources and Environmental Protection Act, MCL 324.61901 *et seq.*, clearly and unambiguously adopts and incorporates the provisions of the Amended Stipulation and Consent Order (ASCO) that governs oil and gas development in the Pigeon River Country State Forest; the nondevelopment region, as defined by the ASCO, includes all land—both public and private—within the PRCSF designated as geographic Units II, III, and IV in the ASCO; the limited development region, as defined by the ASCO, includes all land—both public and private—within the PRCSF designated as geographic Unit I in the ASCO.

*Mika Meyers Beckett & Jones PLC* (by *John M. DeVries* and *Nikole L. Canute*) for petitioners.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *Matthew Schneider*, Chief Legal Counsel, and *Daniel P. Bock*, Assistant Attorney General, for respondent.

Before: BORRELLO, P.J., and SERVITTO and BECKERING, JJ.

PER CURIAM. On April 27, 2012, respondent, the Department of Environmental Quality (DEQ), denied applications for permits submitted by petitioners,

Schmude Oil, Inc., Wellmaster Exploration & Production Co., LLC, and Dennis Schmude to drill Antrim Shale[1] wells. Petitioners appealed respondent's denial of the permits in the Ingham Circuit Court, which affirmed respondent's decision. Petitioners now appeal the circuit court's decision by leave granted. We affirm.

### I. PERTINENT FACTS AND PROCEDURAL HISTORY

In December 2006, petitioners filed ten applications with respondent for permits to drill and operate Antrim Shale wells. On April 9, 2010, petitioners filed an additional application for a permit to drill a brine-disposal well. All 11 proposed well sites were located on the Song of the Morning Ranch (SOMR) property, an 806-acre parcel privately owned by Golden Lotus, Inc. The SOMR is located within the Pigeon River Country State Forest (PRCSF).

Oil and gas drilling in the PRCSF has previously been the subject of litigation in Michigan courts. This Court's opinion in *Hobson Petroleum Corp v Dep't of Quality Control*, unpublished opinion per curiam of the Court of Appeals, issued December 21, 2001 (Docket No. 222992), p 2, provides the following concise history of the PRCSF:

> Pigeon River was dedicated on December 7, 1973, and the Natural Resources Commission adopted "A Concept of Management for the Pigeon River Country." The primary purpose for the dedication was to create a unified management plan to address the potential for disruption wrought by oil and gas development. After the dedication, the then Michigan Department of Natural Resources [DNR], (now Department of Environmental Quality), developed a formal plan to manage the hydrocarbon resources in the

---

[1] The Antrim Shale is a sedimentary rock formation. It is a major source of natural gas production.

Pigeon River area in addition to creating a comprehensive environmental impact statement. . . .

In 1976, [this plan was] incorporated into a consent order and unit agreement with the major oil companies which held the bulk of mineral rights leases within Pigeon River. One year after the consent agreement, litigation arose over drilling exploratory wells within Pigeon River, which culminated in the Michigan Supreme Court issuing a permanent injunction prohibiting drilling of the wells in that area. See *West Michigan Environmental Action Council v Natural Resources Comm*, 405 Mich 741, 760; 275 NW2d 538 (1979).

In 1980, negotiations between environmental groups, oil companies, and the State, resulted in a second consent order [the Amended Stipulation and Consent Order (the ASCO)]. The second consent order was similar to the 1976 order . . . .

Additionally, during this time, the Legislature passed an act incorporating the plan outlined by the consent orders which delineated the framework for all hydrocarbon development within the Pigeon River area. The act incorporated the provisions of the 1980 consent order which included a "nondevelopment region" where no drilling could occur.

The ASCO also created a "limited development region" where drilling could occur, subject to certain limitations. These regions were determined geographically as discrete units on a map of the PRCSF in appendices to the ASCO, with Unit I signifying the limited development region and Units II, III, and IV signifying the nondevelopment regions. The boundary between Units I and II bisects the SOMR property; 180 acres are in Unit I and 640 acres are in Unit II. In this case, eight of petitioners' proposed well sites were within Unit II, while the other three were in Unit I.

The DEQ Office of Geological Survey (OGS) responded to petitioners' permit applications and concluded that whether it would be unlawful for respon-

dent to issue some or all of the SOMR well permit applications depended on whether the Pigeon River Country State Forest hydrocarbon development act of 1980 (PRHDA), also referred to as Part 619 of the Natural Resources and Environmental Protection Act (NREPA),[2] applies to privately owned land within the boundaries of the PRCSF. The OGS concluded that the Part 619 applies to private lands, but suggested that horizontal wells could be a viable alternative to traditional vertical wells and would potentially be in compliance with the PRHDA. On July 10, 2007, respondent required petitioners to produce evidence of feasible and prudent alternatives, which petitioners did, under protest. Petitioners presented evidence that horizontal drilling would be high risk and economically unsound.

In a letter dated January 4, 2011, Harold R. Fitch, the assistant supervisor of wells for OGS, denied 9 of petitioners' 11 permit applications. Fitch stated that eight of the proposed wells were within the nondevelopment region and that the permits for those wells had to be denied. The three other wells were within the limited development region. Fitch denied the permit application for one of the wells in the limited development region because it was within 1/4 mile of the Pigeon River, and, therefore, "[did] not comply with Part 619." Fitch approved the permit applications for one Antrim Shale well and one brine-disposal well in the limited development region. Fitch also concluded that drilling horizontal wells from surface locations would comply with Part 619.

Petitioners appealed this decision to the director of the DEQ, Dan Wyant. Wyant concluded that Part 619 applied to both public and private lands within the PRCSF, and denied the appeal. Petitioners appealed

---

[2] MCL 324.61901 *et seq.*

that decision in the Ingham Circuit Court, which subsequently affirmed Wyant's decision. The case is now before us on leave granted.

## II. WHETHER THE ASCO APPLIES TO PRIVATE LAND

This case requires us to review the circuit court's review of an agency decision. "[W]hen reviewing a lower court's review of agency action this Court must determine whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's factual findings." *Boyd v Civil Serv Comm*, 220 Mich App 226, 234; 559 NW2d 342 (1996). The facts are not in dispute, and the only question is whether respondent violated the law in denying petitioners' well permit applications. Determining whether respondent's decision was authorized by law requires statutory interpretation. This Court reviews de novo issues of statutory interpretation. *Burleson v Dep't of Environmental Quality*, 292 Mich App 544, 548; 808 NW2d 792 (2011).

We first consider whether Part 619 adopted and incorporated the provisions of the ASCO, and conclude that it did. We begin by analyzing the sections of Part 619. MCL 324.61901 states:

> (1) The legislature finds that it is in the public interest to encourage and promote safe, effective, efficient, and environmentally prudent extraction of hydrocarbon resources in the Pigeon river country state forest; and that economic benefits to the state will result from the exploration for the production of energy resources due to the taxation of production of hydrocarbon deposits and the payment of royalties to the state from production of hydrocarbon deposits, which royalties among other things enable the state to acquire and develop property for the enjoyment of the outdoor recreationists of the state.

(2) The legislature further finds that wise use of our natural resources essential for future energy needs requires that energy resource development must occur in harmony with environmental standards; and that the development of new industry and the expansion of existing industry to obtain the optimum safe production of the state's energy resources is an important concern to the economic stability of this state.

MCL 324.61902 provides:

The Pigeon river country state forest as dedicated by the commission on December 7, 1973, is a valuable public resource. It is in the public interest to produce oil and gas as quickly as possible to minimize the duration of activities associated with hydrocarbon development in the Pigeon river country state forest. To expedite the development of oil and gas resources on certain lands presently under lease but undeveloped as of March 31, 1981 and for which the amended stipulation and consent order has been adopted and approved by the commission on November 24, 1980, and in consideration of the protracted nature of the controversy, *the legislature finds that this amended stipulation and consent order constitutes an appropriate hydrocarbon development plan for the purposes and within the intent expressed in section 61901.* [Emphasis added.]

MCL 324.61903, like § 61902, mentions the ASCO, and provides:

The hydrocarbon activities within the Pigeon river country state forest *authorized by the plan referred to in section 61902* can be carried out without violation of law under terms of the amended stipulation and consent order referred to in section 61902. [Emphasis added.]

Further, MCL 324.61904 states:

In light of the legislative findings in section 61901, the declaration of public interest in section 61902, and the determination that hydrocarbons can be developed in concert with law in section 61903, *the department shall imple-*

*ment the approved hydrocarbon development plan for the*
*Pigeon river country state forest not later than January 1,*
*1981.* [Emphasis added.]

The ASCO, which is referred to in §§ 61902 through
61904, designates certain lands in the PRCSF as the
"nondevelopment region" when it states, in relevant
part:

> The parties to this Amended Stipulation declare that an
> area within the Pigeon River Country State Forest, which
> is described as follows:
>
>> *all the lands within the boundaries of the Pigeon*
>> *River Country State Forest designated on the map in*
>> *Appendix A as: Unit IV; Unit II; and, Unit III, except*
>> *sections and portions of sections 19, 20, 21, 22 and 23*
>> *in T33N, R1E.*
>
> (hereinafter referred to as the "nondevelopment" re-
> gion) will <u>not</u> be subject to oil and gas development.

"The primary goal of statutory construction is to give
effect to the Legislature's intent." *McCormick v Car-*
*rier*, 487 Mich 180, 191; 795 NW2d 517 (2010). If the
language of the statute is clear and unambiguous, "it is
presumed that the Legislature intended the meaning
expressed in the statute." *Id.* "Judicial construction of
an unambiguous statute is neither required nor permit-
ted." *Id.* at 191-192. "When reviewing a statute, all
non-technical words and phrases shall be construed and
understood according to the common and approved
usage of the language, and, if a term is not defined in
the statute, a court may consult a dictionary to aid it in
this goal." *Id.* at 192. (citations and quotation marks
omitted).

MCL 324.61902 explicitly states that the "amended
stipulation and consent order constitutes an appropri-
ate hydrocarbon development plan[.]" This language

clearly and unambiguously indicates the Legislature's intent was to adopt the plan. And, when viewed in context with the other sections of Part 619, there can be no doubt of the Legislature's intent. Words and phrases in statutes must be read in context. *Bush v Shabahang*, 484 Mich 156, 167; 772 NW2d 272 (2009). Section 61903 refers to both the hydrocarbon development plan and the ASCO itself when it states that the hydrocarbon activities in the PRCSF "authorized by the plan referred to in section 61902 can be carried out without violation of law[.]" Further, § 61904 states that "the department [DEQ] shall implement the approved hydrocarbon development plan" for the PRCSF. Though the language of § 61902 is clear and unambiguous in its own right, when read in the context of the surrounding sections, there can be no doubt that the Legislature adopted the ASCO.

Having concluded that Part 619 expressly adopted the ASCO, we now turn to the language contained in the ASCO and determine whether the plain language of the ASCO required respondent to deny petitioners' permit applications. See *Jager v Rostagno Trucking Co*, 272 Mich App 419, 423; 728 NW2d 467 (2006) (explaining that when a statute adopts or incorporates by reference a rule or regulation, the adopted or incorporated provision becomes a part of the statute).

A. DENIAL OF THE PERMITS IN THE "NONDEVELOPMENT REGION"

The ASCO refers to a "nondevelopment region" that includes *all* lands within the boundary of the PRCSF designated as geographic Units II, III, and IV on a map in Appendix A. The word "all" is defined, in part, by *Random House Webster's College Dictionary* (2001) as follows: "**1.** the whole or full amount of . . . . **4.** any; any whatever . . . . **10.** everything . . . . **12.** the entire area,

place, environment, or the like[.]" By using the term "all," the ASCO clearly refers to the whole and full amount of lands, any lands, and the entire area of the lands within Units II, III, and IV designated on the map in Appendix A; the term is all-inclusive and indicates that everything within the boundaries of those units is within the nondevelopment region.[3] Therefore, the ASCO contains no differentiation between public and private lands, given that both types of lands fall under the plain meaning of "all."

In this case, it is undisputed that the SOMR is within the boundaries of the PRCSF as designated in the map in Appendix A to the ASCO, and that eight of the permits at issue were within the nondevelopment region. The ASCO makes no distinction between public and private lands. This leads to the conclusion that the pertinent section of the SOMR is in the nondevelopment region, even though it sits on private land. As previously noted, the ASCO states that the nondevelopment region "will not be subject to oil and gas development." Therefore, respondent was required to deny the eight applications for permits within the nondevelopment region.

Petitioners disagree that the restrictions contained in the ASCO apply to private lands, and argue that § 61902 is a definition section, which defines the land to which the nondevelopment region refers as strictly the land dedicated by the commission on December 7, 1973. This argument ignores the plain language of the statute that adopts the ASCO, and the express language of the ASCO. The sentence to which petitioners refer reads: "The Pigeon river country state forest as dedicated by the commission on December 7, 1973, is a valuable

---

[3] Only those sections and portions of sections specifically identified as being excepted from the general rule would be excluded.

public resource." MCL 324.61902. This sentence is not a part of a larger definition section, nor does it define the PRCSF. Rather, it simply states that the PRCSF is a "valuable public resource." Nothing within § 61902 appears to define the scope of the PRCSF; instead, as previously noted, the scope of the PRCSF is found within the plain language of the ASCO itself.

In addition, petitioners argue that the repeated use of the phrase "Pigeon River Country State Forest" in Part 619 and in the ASCO serves to limit the application of the restrictions pertaining to the nondevelopment region to state-owned lands, because, petitioners contend, only state-owned lands can constitute the PRCSF. We reject petitioners' argument because it ignores the plain language of the ASCO—namely, that the restrictions pertaining to the nondevelopment region apply to *all lands* within the boundaries of the PRCSF designated as Units II, III, and IV on the map in Appendix A of the ASCO, which is titled "Pigeon River Country State Forest."[4] It is undisputed that the SOMR is located within the boundaries of the map in Appendix A to the ASCO, and that the pertinent permits petitioners sought are within the nondevelopment region. Thus, the plain language of the ASCO compels the conclusion that respondent was required to deny petitioners' permit applications in the nondevelopment region, regardless of whether Part 619 and the ASCO use the phrase "Pigeon River Country State Forest" elsewhere. In order to adopt petitioners' argument, this Court would need to ignore the plain and unambiguous language of the ASCO, which it cannot do.

Next, petitioners assert that other sections of NREPA, specifically Parts 17 and 615, are *in pari materia* with Part 619. Therefore, petitioners argue, the

---

[4] Capitalization altered.

Court must read Parts 17 and 615 together with Part 619 when interpreting Part 619. " '[T]he interpretive aid of the doctrine of *in pari materia* can only be utilized in a situation where the section of the statute under examination is itself ambiguous.' " *In re Indiana Mich Power Co*, 297 Mich App 332, 344; 824 NW2d 246 (2012), quoting *Tyler v Livonia Pub Schs*, 459 Mich 382, 392; 590 NW2d 560 (1999). In this case, the language of Part 619 is clear and unambiguous; therefore, we need not resort to the rule concerning statutes that are *in pari materia*. Additionally, even were we to read the statutes *in pari materia*, they do not, as petitioners argue, express a policy favoring drilling. MCL 324.61502 declares, in pertinent part:

> It has long been the declared policy of this state to foster conservation of natural resources so that our citizens may continue to enjoy the fruits and profits of those resources. Failure to adopt such a policy in the pioneer days of the state permitted the unwarranted slaughter and removal of magnificent timber abounding in the state, which resulted in an immeasurable loss and waste.

MCL 324.61901(1) provides:

> [I]t is in the public interest to encourage and promote safe, effective, efficient, and environmentally prudent extraction of hydrocarbon resources in the Pigeon river country state forest; and that economic benefits to the state will result from the exploration for the production of energy resources due to the taxation of production of hydrocarbon deposits and the payment of royalties to the state from production of hydrocarbon deposits, which royalties among other things enable the state to acquire and develop property for the enjoyment of the outdoor recreationists of the state.

As the circuit court stated, "A reading of the NREPA and its provisions as a whole demonstrates that oil and gas production is favored only where it is environmen-

tally prudent and does not have a negative effect on other valuable natural resources." The language in NREPA that deals with oil and gas production seeks a balance between Michigan's interest in protecting the environment and its interest in harvesting valuable hydrocarbon resources. Neither § 61502 nor § 61901 expresses, as petitioners argue, a clear public policy favoring drilling.

Concerning Part 17, there is no language whatsoever that supports a public policy favoring drilling. MCL 324.1701 creates a cause of action for NREPA violations. The "pollution, impairment, or destruction" language in § 1701(1) to which petitioners refer does not relate in any way to the approval or prohibition of permits; it only relates to the requirements to bring an action. Further, MCL 324.1705(2) simply states that "alleged pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources" shall be determined in administrative, licensing, or other proceedings, and in the judicial review of such proceedings, as it was in this case. Nowhere in § 1705, nor anywhere else in Part 17, does it state that absent a finding of pollution, impairment, or destruction, an action such as a permit application must or shall be authorized. Nor does MCL 324.1705 state that even if there is a finding of pollution, impairment, or destruction that a permit application must be approved if there is no feasible and prudent alternative as petitioners suggest.

### B. DENIAL OF THE PERMIT IN THE LIMITED DEVELOPMENT REGION

The plain language in the ASCO defining the limited development region also applies to respondent's denial of a permit located within the limited development region. The ASCO states that Unit I is a limited development region:

The parties to this Amended Stipulation declare that an area within the Pigeon River Country State Forest, which is described as follows:

*all the lands within the boundaries of the Pigeon River Country State Forest designated on the map in Appendix A as Unit I*

(hereinafter referred to as "the limited development region")

is subject to oil and gas development pursuant to the limitations of this Amended Stipulation.

Concerning limitations on drilling in the limited development region, the ASCO states that

*no well sites . . . will be placed within ¹/₄ mile of surface water in the limited development region* as identified in Appendix C. The Director, however, may allow encroachment in this ¹/₄ mile zone only upon a determination that environmental impacts can be significantly reduced in other areas by allowing the encroachment, and upon a determination that there will be no pollution of the surface waters.[5] [Emphasis added.]

In the case at bar, the DEQ denied one of petitioners' permit applications because the permit sought permission to drill within ¹/₄ mile of water in the limited development region. The plain language of the ASCO directed that the restrictions imposed in the limited development region apply to *all lands* within the

---

[5] Although the ASCO provides that no well sites may be placed within ¹/₄ mile of surface water in the limited development region, it states that the director of the DNR (now DEQ) may allow encroachment within the ¹/₄ mile zone upon a determination that environmental impacts can be significantly reduced in other areas, and upon a determination that the surface water will not be polluted. We note that the issue of whether the Director of the DEQ could review for encroachment was not raised by petitioner before the circuit court or this Court. Accordingly, we do not consider the issue. *Mayberry v Gen Orthopedics, PC*, 474 Mich 1, 4 n 3; 704 NW2d 69 (2005) (noting that Michigan's appellate courts do not generally address unbriefed issues).

boundaries of the PRCSF that constitute the limited development region. Using the same logic previously set forth in this opinion, the plain language of the ASCO required the DEQ to deny petitioners' permit application for a well located within 1/4 mile of a body of water in the limited development region.

### III. CONSTITUTIONAL CLAIMS

Next, petitioners contend that the denial of their applications for drilling permits constituted a regulatory taking,[6] an issue we review de novo. See *Leelanau Co Sheriff v Kiessel*, 297 Mich App 285, 292; 824 NW2d 576 (2012). Petitioners allege a categorical taking as well as a taking under the balancing test set forth in *Penn Central Transp Co v New York City*, 438 US 104; 98 S Ct 2646; 57 L Ed 2d 631 (1978).[7]

"The federal and state constitutions both proscribe the taking of private property for public use without just compensation." *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 272; 761 NW2d 761 (2008). "The constitutional requirement that the state provide just compensation for the taking of one's property is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and

---

[6] Although the constitutional claims were not addressed below, we will consider them. See *Consumers Power Co v Ass'n of Businesses Advocating Tariff Equity*, 205 Mich App 571, 575; 518 NW2d 514 (1994).

[7] In addition, petitioners allege a taking because "the denial of [petitioners'] applications for drilling permits . . . fails to substantially advance a legitimate government interest . . . ." While our caselaw formerly recognized the "advance[s] a legitimate state interest" test as an additional test for determining whether a taking occurred, *K & K Constr, Inc v Dep't of Natural Resources*, 456 Mich 570, 585; 575 NW2d 531 (1998) (*K & K Constr I*), the United States Supreme Court has since repudiated that test, *Lingle v Chevron USA, Inc*, 544-545 US 528, 540-545; 125 S Ct 2074; 161 L Ed 2d 876 (2005).

justice, should be borne by the public as a whole." *K & K Constr, Inc v Dep't of Environmental Quality*, 267 Mich App 523, 551-552; 705 NW2d 365 (2005) (citations and quotation marks omitted) (*K & K Constr II*).

### A. CATEGORICAL TAKING

We first address petitioners' claim that the denial of their applications for drilling permits was a categorical taking. "For a categorical taking to exist, there must be a denial of *all* economically beneficial or productive use of land." *K & K Constr, Inc v Dep't of Natural Resources*, 456 Mich 570, 586; 575 NW2d 531 (1998) (citation and quotation marks omitted; emphasis added) (*K & K Constr I*). When the government action in question diminishes the value of the land, but does not completely deprive the land of all value, the landowner cannot establish a categorical taking. *Id.* at 587 n 13. In this case, petitioners cannot establish a categorical taking because the denial of their applications for permits did not completely deny petitioners of *all* economically beneficial or productive use of their oil and gas leases. Indeed, petitioners could still operate wells in the limited development region and they could utilize horizontal drilling at the other well locations.

In reaching this conclusion, we reject petitioners' claim that the instant case is comparable to this Court's decision in *Miller Bros v Dep't of Natural Resources*, 203 Mich App 674; 513 NW2d 217 (1994). In *Miller Bros*, the plaintiffs had one, and only one, interest and viable economic use in the land—the extraction of oil and gas. *Id.* at 679-680. The denial of permits denied the plaintiffs this only viable economic use; therefore, by exercise of regulatory power, the government so restricted the use of the plaintiffs' property that they were deprived of all economically viable use of the land.

*Id.* at 680. By contrast, petitioners can still operate wells in the limited development region. They can also utilize horizontal drilling. Although horizontal drilling will increase petitioners' costs, "[t]he Taking Clause does not guarantee property owners an economic profit from the use of their land." *Paragon Props Co v Novi*, 452 Mich 568, 579 n 13; 550 NW2d 772 (1996). When the land still has some economic value, even if a fraction of the economic value that could have been realized, there is no categorical taking. *K & K Constr I*, 456 Mich at 587 n 13.

### B. TAKING UNDER THE *PENN CENTRAL* BALANCING FACTORS

"Regulatory taking claims that do not rise to the level of a categorical taking are governed by the standard set out in *Penn Central Transp Co v New York City*, 438 US 104; 98 S Ct 2646; 57 L Ed 2d 631 (1978)." *Chelsea Investment Group LLC v Chelsea*, 288 Mich App 239, 261; 792 NW2d 781 (2010).

> The balancing test announced in [*Penn Central*] requires a reviewing court to engage in an ad hoc factual inquiry, focusing on "(1) the character of the government's action, (2) the economic effect of the regulation on the property, and (3) the extent by which the regulation has interfered with distinct, investment-backed expectations." [*Id.*, quoting *K & K Constr I*, 456 Mich at 577.]

Stated another way, if the regulation at issue:

> (1) is comprehensive and universal so that the private property owner is relatively equally benefited and burdened by the challenged regulation as other similarly situated property owners, and (2) if the owner purchased with knowledge of the regulatory scheme so that it is fair to conclude that the cost to the owner factored in the effect of the regulations on the return on investment, and (3) if, despite the regulation, the owner can make valuable use of

his or her land, then compensation is not required under *Penn Central*. [*K & K Constr II*, 267 Mich App at 529.]

Regarding the first factor, we consider whether the government's action "singles [a] plaintiff[] out to bear the burden for the public good and whether the regulation being challenged is a comprehensive, broadly based regulatory scheme that burdens and benefits all citizens relatively equally." *Chelsea Investment Group LLC*, 288 Mich App at 262 (citation and quotation marks omitted; alterations in original). In this case, the prohibition on drilling in the nondevelopment area did not single out petitioners to bear the burden for the public good. Rather, the prohibition was a comprehensive scheme that applied to all landowners within the nondevelopment region. See *K & K Constr II*, 267 Mich App at 559-560, 562-563. This factor does not weigh in petitioners' favor.

Concerning the second factor, the economic effect of the regulation on the property, we do not find that this factor weighs in petitioners' favor. Although the outright prohibition of drilling or the utilization of horizontal drilling will have a negative effect on petitioners' oil and gas leases, petitioners are not without some value in the leases. That this value was less than petitioners had originally hoped does not mean that the regulation amounts to a taking. *Chelsea Investment Group LLC*, 288 Mich App at 262-263. Indeed, on the evidence presented by petitioners, we do not find the reduction in economic value to be enough to weigh this factor in petitioners' favor. See *K & K Constr II*, 267 Mich App at 553-554.

Regarding the third factor, we must "examine the extent to which the regulation has interfered with the property owner's reasonable investment-backed expectations." *Id.* at 555 (citation and quotations marks

omitted). "A key factor is notice of the applicable regulatory regime . . . ." *Id*. Notice of the regulatory regime at the time the claimant acquires the property helps to determine the reasonableness of the claimant's investment-backed expectations. *Id*. at 556. Petitioners had notice of the regulations at the time they acquired their interests in the property because they acquired their interests in the oil and gas leases in 2006, well after the enactment of Part 619. Although petitioners sought a different interpretation of Part 619, they at least should have been aware of the plain language of the ASCO and its prohibitions against drilling. At the very least, the fact that the plain language of the statute was contrary to petitioners' position should have tempered petitioners' *reasonable* expectations when acquiring the oil and gas leases. Therefore, we find that the drilling prohibition in Part 619 has not interfered with petitioners' reasonable investment-backed expectations. See *id*. at 558.

Accordingly, we conclude that petitioners have failed to establish a regulatory taking under the *Penn Central* balancing test.

### C. EQUAL PROTECTION

Lastly, petitioners allege that the regulations set forth in Part 619, through its adoption of the ASCO, amount to an equal protection violation because those regulations draw classifications between different groups of private landowners in the PRCSF by arbitrarily classifying certain lands as belonging to the nondevelopment region.

The United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." US Const, Am XIV, § 1. Likewise, the Michigan Constitution provides that "[n]o

> person shall be denied the equal protection of the laws . . . ." Const 1963, art 1, § 2. [*Grimes v Van Hook-Williams*, 302 Mich App 521, 532; 839 NW2d 237 (2013).]

"The constitutional guarantee of equal protection ensures that people similarly situated will be treated alike, but it does not guarantee that people in different circumstances will be treated the same." *Brinkley v Brinkley*, 277 Mich App 23, 35; 742 NW2d 629 (2007). "[E]qual protection does not require the same treatment be given those that are not similarly situated." *Champion v Secretary of State*, 281 Mich App 307, 325; 761 NW2d 747 (2008) (citation and quotation marks omitted; alteration in original). "To be considered similarly situated, the challenger and his comparators must be *prima facie* identical in all relevant respects or directly comparable . . . in all material respects." *Lima Twp v Bateson*, 302 Mich App 483, 503; 838 NW2d 898 (2013) (citations and quotation marks omitted).

Petitioners take umbrage with the fact that the ASCO divides the PRCSF into different development regions. Petitioners make no effort to argue that landowners in the nondevelopment regions are similarly situated to landowners in other regions of the PRCSF where drilling is permitted. Indeed, they make no effort to argue that the characteristics of the land in each region are identical, or that the environmental concerns, if any, that are present in the different regions are identical. Because they make no effort to argue that they were similarly situated, we find that this issue is abandoned and could decline to review the claim. See *Ypsilanti Charter Twp*, 281 Mich App at 287.

However, even assuming petitioners could establish that landowners in the nondevelopment region are similarly situated to landowners in the limited development region, petitioners' claim would lack merit. Peti-

tioners acknowledge that the instant case does not involve a suspect classification, and that the rational basis test is the appropriate test to use for their equal protection claim. "Under the rational basis test, the statute will be upheld as long as the classification scheme is rationally related to a legitimate governmental purpose." *Brinkley*, 277 Mich App at 35. Under rational basis review, we presume that the challenged statute is constitutional, and the party challenging the statute has a heavy burden in rebutting that presumption. *Crego v Coleman*, 463 Mich 248, 260; 615 NW2d 218 (2000). "A classification reviewed on this basis passes constitutional muster if the legislative judgment is supported by any set of facts, either known or which could reasonably be assumed, even if such facts may be debatable." *Id.* at 259-260.

Part 619 declares that the Legislature "finds that it is in the public interest to encourage and promote safe, effective, efficient, and environmentally prudent extraction of hydrocarbon resources in the Pigeon river country state forest . . . ." MCL 324.61901(1). Part 619 further provides that "wise use of our natural resources essential for future energy needs requires that energy resource development must occur in harmony with environmental standards . . . ." MCL 324.61901(2). The ASCO, which was expressly adopted by Part 619, declares that "[t]he protection of the public health, safety and welfare and the preservation of the natural resources of the State of Michigan are paramount social concerns." It further declares that the plan set forth in the ASCO, which includes the creation of a nondevelopment region, was established "[i]n light of the aforementioned interests . . . ." Assuming, for the purpose of argument, that the land in the nondevelopment region on which petitioners' oil and gas leases is located is similarly situated to land in the limited development

region, we find that the classification meets the rational basis test. Given that the Legislature adopted a plan in the ASCO that created different types of development regions with the intended goal of protecting and preserving resources while at the same time promoting the wise use of natural resources, we can assume that the different development regions faced different environmental concerns. See *Crego*, 463 Mich at 259-260 (stating that a classification passes constitutional muster under rational basis review if it "is supported by any set of facts, either known or *which could reasonably be assumed*, even if such facts may be debatable") (emphasis added). Consequently, we find that the classification scheme, if any, created by Part 619 and the ASCO was rationally related to a legitimate governmental interest.

Because we conclude that Part 619 is controlling and that petitioners' constitutional claims lack merit, we need not address the remainder of petitioners' arguments.

Affirmed.

BORRELLO, P.J., and SERVITTO and BECKERING, JJ., concurred.