# STATE OF MICHIGAN

# COURT OF APPEALS

---

JOHN DOES 1-7, and all others similarly situated,

Plaintiffs-Appellees,

v

DEPARTMENT OF CORRECTIONS,
GOVERNOR, DEPARTMENT OF
CORRECTIONS DIRECTOR, CORRECTIONAL
FACILITIES ADMINISTRATION DEPUTY
DIRECTOR, CORRECTIONAL FACILITIES
ADMINISTRATION DEPUTY DIRECTOR
RETIRED, CORRECTIONAL FACILITIES
ADMINISTRATION CHIEF DEPUTY
DIRECTOR, CARSON CITY CORRECTIONAL
FACILITY WARDEN, GUS HARRISON
CORRECTIONAL FACILITY WARDEN,
RICHARD A. HANDLON CORRECTIONAL
FACILITY WARDEN, OAKS CORRECTIONAL
FACILITY WARDEN, THUMB
CORRECTIONAL FACILITY WARDEN,
CHIPPEWA CORRECTIONAL FACILITY
WARDEN, MARQUETTE BRANCH PRISON
WARDEN, BELLAMY CREEK
CORRECTIONAL FACILITY WARDEN,
CHARLES EGELER RECEPTION &
GUIDANCE CENTER WARDEN, E.C. BROOKS
CORRECTIONAL FACILITY WARDEN,

Defendants-Appellants.

FOR PUBLICATION
August 25, 2015
9:05 a.m.

Nos. 321013; 321756
Washtenaw Circuit Court
LC No. 13-001196-CZ

---

Before: RIORDAN, P.J., and DONOFRIO and BECKERING, JJ.

RIORDAN, J.

Defendants, various government entities including the Department of Corrections and the Governor, originally appealed by leave the trial court orders denying their motions for summary disposition in this action initiated by plaintiffs, who are male prisoners.

-1-

In Docket No. 321013, defendants appealed the trial court order denying their motion for summary disposition based on plaintiffs' failure to comply with the Prison Litigation Reform Act (PLRA), MCL 600.5501 *et seq.* In Docket No. 321756, defendants appealed the trial court order denying their motion for summary disposition based on the prisoners' substantive discrimination claims.

This Court initially denied defendants' applications for leave to appeal. The Supreme Court, in lieu of granting leave to appeal, remanded the case back to this Court for consideration as leave granted. *Doe v Dep't of Corrections*, __ Mich __; 854 NW2d 717 (2014). Now having reviewed the issues raised on appeal, we reverse and remand for proceedings consistent with this opinion.

## I. BACKGROUND

Plaintiffs are seven, unidentified males who became imprisoned while under the age of 18, in Department of Corrections (DOC) facilities. Plaintiffs bring suit under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, claiming that they had been subject to sexual violence and harassment by adult male prisoners and female prison guards.

Defendants eventually moved for summary disposition on several grounds. First, they contend that plaintiffs failed to comply with MCL 600.5507(2), a provision of the PLRA requiring that a prisoner filing a lawsuit concerning prison conditions disclose the number of civil actions and appeals the prisoner previously initiated. Defendants alleged that plaintiffs' disclosure was insufficient. Defendants further argued that, because MCL 600.5507(3) provides that a court "shall" dismiss any action if the prisoner fails to comply with subsection (2), plaintiffs' complaint had to be dismissed without prejudice. MCR 2.116(C)(4). Plaintiffs countered that MCL 600.5507 only applied to complaints filed on behalf of indigent prisoners, which did not include the prisoners in this case. The trial court ultimately denied defendants' motion for summary disposition.

Defendants also moved for summary disposition under MCR 2.116(C)(8), contending that plaintiffs failed to state a claim upon which relief can be granted because the plain language of the ELCRA, as amended, provides that a "public service" does not include a state or county correctional facility with respect to prisoners. Defendants further argued that the amendment did not violate equal protections. Plaintiffs vigorously disputed this point, arguing that the amendment was unconstitutional because it violated plaintiffs' rights to equal protection, with no legitimate justification. They also highlighted that a federal district court case had found the amendment to be unconstitutional, and that decision was binding on the court.

The crux of plaintiffs' equal protection argument at this juncture is not based on the allegation that their fundamental right to be free from sexual assault is being violated. Rather, plaintiffs' contention is that the ELCRA violates their right to equal protection because it prohibits them from filing a lawsuit based on their status as prisoners, regardless of the type of claim they seek to assert.

The trial court ultimately denied defendants' motion for summary disposition. It ruled that MCL 37.2301(b), which excluded prisons as places of public services under the ELCRA,

was unconstitutional because it violated the equal protection clauses of the Michigan and United States Constitutions. Defendants now appeal in both dockets.

## II. STANDARDS OF REVIEW

"The interpretation and application of statutes is a question of law that we review de novo." *Ewin v Burnham*, 272 Mich App 253, 255; 728 NW2d 463 (2006).[1] We also review constitutional issues de novo. *Mahaffey v Attorney Gen*, 222 Mich App 325, 334; 564 NW2d 104 (1997). "Statutes are presumed to be constitutional, and we have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Mayor of Cadillac v Blackburn*, 306 Mich App 512, 516; 857 NW2d 529 (2014) (quotation marks and citation omitted). Additionally, we review issues concerning the application of collateral estoppel *de novo*. *Barrow v Pritchard*, 235 Mich App 478, 480; 597 NW2d 853 (1999).

## III. PRISON LITIGATION REFORM ACT

### A. DISCLOSURE

The PLRA "sets forth certain requirements that apply when a prisoner brings a civil action concerning prison conditions." *Anderson v Myers*, 268 Mich App 713, 715; 709 NW2d 171 (2005) (quotation marks omitted). A "prisoner" is defined as "a person subject to incarceration, detention, or admission to a prison who is accused of, convicted of, sentenced for, or adjudicated delinquent for violations of state or local law . . . ." MCL 600.5531(e). A "civil action concerning prison conditions" is defined as "any civil proceeding seeking damages or equitable relief arising with respect to any conditions of confinement or the effects of an act or omission of government officials, employees, or agents in the performance of their duties . . . ." MCL 600.5531(a). Plaintiffs do not dispute that each one of them is a "prisoner" and that the present case is a "civil action concerning prison conditions." Nor do the parties dispute that plaintiffs are not indigent.

MCL 600.5507, the provision in dispute, provides:

(1) A prisoner shall not claim indigency under [MCL 600.2963[2]] in a civil action concerning prison conditions or an appeal of a judgment in a civil action concerning prison conditions or be allowed legal representation by an attorney who is directly or indirectly compensated for his or her services in whole or in part by state funds if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any prison, brought an action or appeal in a court of

---

[1] To the extent that the parties did not raise the issue of plaintiffs' actual compliance with MCL 600.5507(2), we address this issue as all the facts necessary for a decision regarding this section are before us and resolving the issue primarily is a question of law. *Nuculovic v Hill*, 287 Mich App 58, 63; 783 NW2d 124 (2010). The same is true of the trial court's failure to fully articulate its finding regarding whether it was bound by a federal district court opinion.

[2] MCL 600.2963 deals more specifically with prisoners initiating civil suits.

this state that was dismissed on the grounds that it was frivolous, unless the prisoner has suffered serious physical injury or is under imminent danger of suffering serious physical injury or has suffered or is under imminent danger of suffering conduct prohibited under . . . MCL 750.520b, 750.520c, 750.520d, 750.520e, and 750.520g.

(2) A prisoner who brings a civil action or appeals a judgment concerning prison conditions shall, upon commencement of the action or initiation of the appeal, disclose the number of civil actions and appeals that the prisoner has previously initiated.

(3) The court shall dismiss a civil action or appeal at any time, regardless of any filing fee that may have been paid, if the court finds any of the following:

(a) The prisoner's claim of injury or of imminent danger under subsection (1) is false.

(b) The prisoner fails to comply with the disclosure requirements of subsection (2).

The primary goal of statutory interpretation is to ascertain and give effect to the intent of the Legislature. *Mich Ed Ass'n v Secretary of State (On Rehearing)*, 489 Mich 194, 217; 801 NW2d 35 (2011). "The first criterion in determining intent is the language of the statute. If the statutory language is clear and unambiguous, judicial construction is neither required nor permitted, and courts must apply the statute as written." *Tevis v Amex Assurance Co*, 283 Mich App 76, 81; 770 NW2d 16 (2009). "Courts may not speculate regarding legislative intent beyond the words expressed in a statute. . . . Unless defined in the statute, every word or phrase should be accorded its plain and ordinary meaning, taking into account the context in which the words are used." *Chico-Polo v Dep't of Corrections*, 299 Mich App 193, 198; 829 NW2d 314 (2013) (quotation marks and citation omitted). We also presume every word in a statute has meaning, and avoid construing the statute in a way that would render any part surplusage or nugatory. *Griswold Props, LLC v Lexington Ins Co*, 276 Mich App 551, 565; 741 NW2d 549 (2007). Furthermore, "[a] provision in a statute is ambiguous only if it irreconcilably conflicts with another provision, or when it is *equally* susceptible to more than a single meaning." *Alvan Motor Freight, Inc v Dep't of Treasury*, 281 Mich App 35, 39-40; 761 NW2d 269 (2008) (quotation marks and citation omitted; emphasis in original)

When filing this action, plaintiffs disclosed the following in their complaint:

A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in this court, where it was given docket number 13-1049-CZ and was assigned to Judge Kuhnke. The action is no longer pending.

In addition, a civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in the Eastern District of Michigan and was assigned to Judge Cleland. The action remains pending.

-4-

There are several deficiencies in plaintiffs' disclosures. First, subsection (2) requires a prisoner to "disclose the number of civil actions and appeals that *the prisoner* has previously initiated." (Emphasis added). The language in plaintiffs' complaint is that there were civil actions "between *these parties or other parties* arising out of the transaction or occurrence alleged in the complaint."[3] This disclosure is ambiguous regarding the identities of the parties in the previous litigation, and leaves to speculation whether it was "the prisoner[s]" from this case as a full group, partial group, or individually.

Second, subsection (2) requires disclosure of "the number of civil actions and appeals that the prisoner has *previously initiated*." (Emphasis added). Even assuming that plaintiffs initiated the two previously filed civil actions, their disclosure did not indicate whether those were the only civil actions and appeals they previously initiated as a group or individually. Instead, they disclosed only two previously filed actions "arising out of the transaction or occurrence alleged in the complaint." Yet, the plain language of subsection (2) requires that a prisoner "shall . . . disclose the number of civil actions and appeals that the prisoner has previously initiated." MCL 600.5507(2). There is no limiting language that prisoners only should disclose civil actions arising out of the transaction at issue in the present complaint. Here, plaintiffs' disclosure left open the possibility that any of the plaintiffs initiated civil actions or appeals concerning prison conditions that did not arise out of the transaction or occurrence alleged in the complaint. Further, "[t]he statute does not predicate the disclosure requirement upon the prisoner having, in fact, previously filed civil actions or appeals." *Tomzek v Dep't of Corrections*, 258 Mich App 222, 224; 672 NW2d 511 (2003). So, even if plaintiffs had not initiated any other civil suits, the deficiency in a disclosure statement would not be cured.

Accordingly, we reject any contention that plaintiffs' complaint complied with subsection (2) of MCL 600.5507

## B. INDIGENCY

We now turn to plaintiffs' argument under the PLRA, namely, that subsection (2) does not apply to nonindigent prisoners. We find that it does.

Subsection (2) provides, "*A prisoner who brings a civil action . . . concerning prison conditions shall . . . disclose the number of civil actions . . . that the prisoner has previously initiated.*" (Emphasis added). The words "the" and "a" have different meanings. *Massey v Mandell*, 462 Mich 375, 382 n 5; 614 NW2d 70 (2000). " 'The' is defined as 'definite article. 1. (used, [especially] before a noun, with a specifying or particularizing effect, as opposed to the indefinite or generalizing force of the indefinite article a or an).' " *Robinson v Lansing*, 486 Mich 1, 14; 782 NW2d 171 (2010) (citation omitted).

Subsection (2) employs the word "a" to describe the class of prisoners who must disclose the number of civil actions previously filed. As defined *supra*, "a" has no specifying or particularizing effect. Thus, the plain language of subsection (2) indicates that it applies to

---

[3] Ostensibly, this was an attempt to comply with MCR 2.113(C)(2).

-5-

prisoners, without limitation to indigent prisoners. Indeed, plaintiffs acknowledge that subsection (2) does not expressly limit the requirement to indigent prisoners. Because the statute is unambiguous, we are mindful that nothing may be read into the statute. *Tevis*, 283 Mich App at 81.

Nevertheless, as plaintiffs point out, it is true that a statutory provision cannot be read in isolation. *Robinson*, 486 Mich at 15. See *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 438; 695 NW2d 84 (2005) ("Although a phrase or a statement may mean one thing when read in isolation, it may mean something substantially different when read in context."). However, the remaining language of MCL 600.5507 does not indicate that subsection (2) applies only to indigent prisoners.[4]

Subsection (1) pertains to the limitation for when a prisoner may claim indigency in a civil action under MCL 600.2963.[5] However, the legislature employed no language in subsections (2) or (3) limiting the class of prisoners to those who are indigent, or to those listed in subsection (1). Plaintiffs urge this Court to look at legislative history and the catch line provision in the statute, which states, "Claim of indigency in civil actions concerning prison conditions, prohibitions." "However, the catch line of a statute is not part of the statute itself, and should not be used to construe the section more broadly or narrowly than the text of the section would indicate." *People v Mitchell*, 301 Mich App 282, 292; 835 NW2d 615 (2013). MCL 8.4b provides:

> The catch line heading of any section of the statutes that follows the act section number shall in no way be deemed to be a part of the section or the statute, or be used to construe the section more broadly or narrowly than the text of the section would indicate, but shall be deemed to be inserted for purposes of convenience to persons using publications of the statutes.

We also decline to rely upon legislative history. Legislative intent is discerned from the words of the statute itself as that is what was enacted into law. *Chico-Polo*, 299 Mich App at 198. Furthermore, our interpretation of the statute "ensures that it works in harmony with the entire statutory scheme." *Potter v McLeary*, 484 Mich 397, 411; 774 NW2d 1 (2009); *Bush v Shabahang*, 484 Mich 156, 167; 772 NW2d 272 (2009); *Slater v Ann Arbor Pub Sch Bd of Ed*, 250 Mich App 419, 429; 648 NW2d 205 (2002). Our interpretation is consistent with the underlying purpose of the PLRA, which is to manage the overall number of suits prisoners initiate. See, e.g., MCL 600.5503(1) (prohibiting a prisoner from filing an action concerning prison conditions unless the prisoner has exhausted all available administrative remedies); MCL 600.5503(3) (prohibiting courts from appointing counsel paid for in whole or in part at taxpayer expense to a prisoner for the purpose of filing an action concerning prison conditions); MCL

---

[4] Although plaintiffs attempt to draw an inference from federal law, namely 28 USC 1915, regarding proceedings *in forma pauperis*, nothing in that statute is similar to MCL 600.5507(2) and the language regarding disclosure.

[5] MCL 600.2963 deals more specifically with prisoners filing civil actions.

600.5505(1) and (2) (stating that MCL 600.2963 applies to civil actions concerning prison conditions and requiring courts to dismiss a case at any time for several reasons); MCL 600.5509 (stating that a court shall review as soon as practical a civil action in which a prisoner seeks redress from a government entity and requiring the court to dismiss the action if the complaint is frivolous or seeks monetary relief from a defendant who is immune from the requested relief).

Plaintiffs, however, advance an alternate interpretation of the statute. As discussed, subsection (1) generally prohibits a prisoner from claiming indigency under MCL 600.2963 if the prisoner has, on three or more occasions, while incarcerated or detained in any prison, brought an action that was dismissed because it was frivolous. Plaintiffs contend that subsection (2) is the mechanism for determining whether a prisoner has brought three or more civil actions that have been dismissed as frivolous, thereby preventing them from claiming indigency under subsection (1).

Yet, plaintiffs fail to reference MCL 600.5529, which provides:

(1) The state court administrative office shall compile and maintain a list of the civil actions concerning prison conditions brought by a prisoner that are dismissed as frivolous. The list shall include an account of the amount of unpaid fees and costs associated with each dismissed case. *The list shall be made available to the courts of this state for the purpose of ascertaining the existence and number of civil actions concerning prison conditions filed by each prisoner*, and any associated unpaid fees and costs, for the purposes described in this chapter.

(2) *A court in which a civil action concerning prison conditions is brought shall refer to the list described in subsection (1) to determine the number and existence of civil actions concerning prison conditions previously filed by a prisoner* and any associated unpaid fees and costs. [Emphasis added.]

Thus, pursuant to MCL 600.5529, a court determines whether claims have been dismissed because of frivolity by consulting the list the State Court Administrative Office compiles and maintains. The court does not perform this function based on a prisoner's disclosures under subsection (2). In fact, subsection (2) does not require a prisoner to disclose how many of the civil actions and appeals were dismissed because they were *frivolous*. Rather, it only requires a prisoner to "disclose the number of civil actions and appeals that the prisoner has previously initiated." Because the disclosure required by subsection (2) is not limited to previous civil actions and appeals that were dismissed as frivolous, plaintiffs' argument fails.

Plaintiffs also rely on the rule of statutory construction known as the "absurd-results rule." See *Detroit Intern Bridge Co v Commodities Export Co*, 279 Mich App 662, 674; 760 NW2d 565 (2008). Under this rule, "a statute should be construed to avoid absurd results that are manifestly inconsistent with legislative intent." *Id.* (quotation marks and citation omitted). In other words, "a statute need not be applied literally if no reasonable lawmaker could have conceived of the ensuing result." *Id.* at 675. Plaintiffs assert that absent a relationship between subsections (1) and (2), the disclosure required by subsection (2) serves no purpose. However, the premise of plaintiffs' argument is that the disclosure requirement in subsection (2) serves the

purpose of determining whether a prisoner may claim indigency. Yet, as explained *supra*, plaintiffs are not required to disclose how many of the previous cases were dismissed based on frivolity. Therefore, we reject plaintiffs' argument based on the absurd-results rule.

Furthermore, "[t]he wisdom of a statute is for the determination of the Legislature and the law must be enforced as written." *Gilliam v Hi-Temp Prod Inc*, 260 Mich App 98, 109; 677 NW2d 856 (2003). "The fact that a statute appears to be impolitic, unwise, or unfair is not sufficient to permit judicial construction." *Id.*

Thus, we conclude that the disclosure requirement in MCL 600.5507(2) unambiguously applies to all prisoners, not only those claiming indigency.

## C. REMEDY

Alternatively, plaintiffs contend that the proper remedy for noncompliance with the disclosure requirements is a remand to permit them to amend the complaint, rather than dismissal. We disagree.

Pursuant to MCL 600.5507(3)(b), "The court shall dismiss a civil action or appeal at any time, regardless of any filing fee that may have been paid, if the court finds" that the "prisoner fails to comply with the disclosure requirements of subsection (2)." Despite this clear directive, plaintiffs contend that they should have been permitted to amend their compliant. See MCR 2.118(A)(2) ("Except as provided in subrule (A)(1), a party may amend a pleading only by leave of the court or by written consent of the adverse party. Leave shall be freely given when justice so requires."). Defendants, however, posit that subsection (3) precludes amendment of the complaint because that statute provides that the court *shall* dismiss a civil action if the prisoner fails to comply with subsection (2) of the statute.

The phrase "shall" is unambiguous and denotes "a mandatory, rather than discretionary action." *Roberts v Mecosta Co Gen Hosp*, 466 Mich 57, 65; 642 NW2d 663 (2002). Consistent with the plain language of the statute, in *Tomzek v Dep't of Corrections*, 258 Mich App 222, 223; 672 NW2d 511 (2003), we found "that the statutory language mandates dismissal of the appeal, without regard to how or when the issue was raised." We also recognized the failure to disclose the number of previous civil actions or appeals was fatal, even if that number is zero. *Id.* at 224-225. Likewise, in *Komejan v Dep't of Corrections*, 270 Mich App 398, 399-400; 715 NW2d 375 (2006), we held as follows:

> If a prisoner fails to disclose the number of previous suits, the statute explicitly instructs the court to dismiss the action. MCL 600.5507(3)(b). Plaintiff did not disclose the number of civil actions relating to prison conditions that he had previously pursued, so the trial court should have dismissed this suit. The fact that plaintiff had never pursued a civil action before does not excuse his lack of disclosure because a prisoner is obligated to disclose the number of civil actions and appeals he had previously initiated, even when that number is zero. Plaintiff's failure to disclose the number of previous civil actions he commenced mandates the dismissal of this case. [Quotation marks and citation omitted.]

Relying on federal case law, plaintiffs claim they should be given the opportunity to amend the complaint. However, federal decisions are not binding on this Court. *State Treasurer v Sprague*, 284 Mich App 235, 241; 772 NW2d 452 (2009). Nevertheless, plaintiffs cite to MCL 600.2301, which provides:

> The court in which any action or proceeding is pending, has power to amend any process, pleading or proceeding in such action or proceeding, either in form or substance, for the furtherance of justice, on such terms as are just, at any time before judgment rendered therein. The court at every stage of the action or proceeding shall disregard any error or defect in the proceedings which do not affect the substantial rights of the parties.

The applicability of MCL 600.2301 rests on a two-pronged test: (1) whether a substantial right of a party is implicated; and (2) whether a cure is in furtherance of justice. *Bush*, 484 Mich at 177. Plaintiffs make no argument regarding either prong of this test. *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 287; 761 NW2d 761 (2008) (A party's "failure to properly address the merits of his assertion of error constitutes an abandonment of this issue on appeal.").

Furthermore, plaintiffs' contention is contrary to a cardinal rule of statutory interpretation: "If the language employed by the Legislature is unambiguous, the Legislature is presumed to have intended the meaning clearly expressed, and this Court must enforce the statute as written." *Ameritech Pub, Inc v Dep't of Treasury*, 281 Mich App 132, 136; 761 NW2d 470 (2008). The language of MCL 600.5507(3) is unambiguous. Consistent with our prior, published caselaw, we apply the statute as written and find that dismissal is mandated.

Because a plaintiff would be precluded by statute from going forward with this lawsuit, ordinarily we would need not address plaintiffs' additional claims. But, because it is not clear whether any of the John Doe plaintiffs would be free, individually, in the future to bring the claims they now allege under the ELCRA and equal protections, we will consider them here. Further, the Michigan Supreme Court specifically remanded this case for consideration of the issues raised on leave granted. *Doe v Dep't of Corrections*, __ Mich at __; 854 NW2d 717 (2014).

## IV. ELLIOTT-LARSEN CIVIL RIGHTS ACT

### A. BACKGROUND LAW

Defendants contend that the trial court erred in denying their second motion for summary disposition regarding plaintiffs' substantive claims based on the ELCRA. Primarily, defendants argue that the amendment to the ELCRA, which excluded prisoner lawsuits, is not a violation of equal protections.

The ELCRA provides:

> The opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, height, weight, familial status, or marital status as

prohibited by this act, is recognized and declared to be a civil right. [MCL 37.2102(1).]

The statute further provides that "[e]xcept where permitted by law, a person shall not . . . Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status." MCL 37.2302(a).

In *Neal v Dep't of Corrections (On Rehearing)*, 232 Mich App 730, 735-737; 592 NW2d 370 (1998), we held that prisons are places of "public service" under the ELCRA, so that discrimination against inmates is prohibited. However, the Legislature then passed 1999 PA 202,[6] which amended the definition of "public service" in the ELCRA. "Public service" now is defined as:

> (b) "Public service" means a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof or a tax exempt private agency established to provide service to the public, *except that public service does not include a state or county correctional facility with respect to actions and decisions regarding an individual serving a sentence of imprisonment.* [MCL 37.2301(b) (Emphasis added).]

The amendment was "curative and intended to correct any misinterpretation of legislative intent in the court of appeals decision Neal v Department of Corrections, 232 Mich App 730 (1998). This legislation further expresses the original intent of the legislature that an individual serving a sentence of imprisonment in a state or county correctional facility is not within the purview of this act." 1999 PA 202, enacting § 1. On appeal, the parties do not dispute that the 1999 amendment's definition of "public service" bars the prisoners' lawsuit under the ELCRA. Instead, plaintiffs attack the amendment directly, arguing that it violates their equal protection rights.

Plaintiffs also contend that a federal district court case, *Mason v Granholm*, unpublished opinion of the Eastern District Court of Michigan, issued January 23, 2007 (Docket No. 05-73943), precludes defendants from arguing otherwise. In *Mason*, virtually no factual background regarding the plaintiffs or the case was provided in the court's opinion. The court briefly summarized *Romer v Evans*, 517 US 620, 633; 116 S Ct 1620; 134 L Ed 2d 855 (1996), finding it to be an example of when the "Supreme Court struck down an amendment to the Colorado Constitution that prohibited legislative, executive, or judicial action at any level of state or local government designed to protect gays and lesbians."[7] The *Mason* court then opined:

---

[6] Although not effective until 2000, this will be referred to as the 1999 amendment.

[7] Unlike Amendment 2 to the Colorado Constitution in *Romer*, which prohibited any governmental action designed to protect homosexuals, here the 1999 Amendment does not make it more difficult for prisoners to seek aid from the government. More importantly, the 1999

The MDOC does not argue that the ELCRA amendment advances legitimate penological interests, such as maintaining prison order. Rather, the MDOC contends that the ELCRA amendment does advance legitimate interests such as protecting the public fisc, preventing windfall awards, reducing judicial intervention in the management of prisons, deterring frivolous lawsuits by prisoners and reducing trivial or inconsequential suits. In support of its argument that the ELCRA amendment is constitutional, MDOC cites to several Sixth Circuit cases upholding challenges to the federal Prison Litigation Reform Act [PLRA], which placed some restrictions on prisoners' ability to file civil rights claims.

In contrast to the PLRA provisions upheld in . . . other cases, the ELCRA amendment paints with a much broader brush. Rather than placing some limits on prisoner litigation and deterring frivolous suits, the ELCRA amendment completely precludes prisoners from challenging the conditions of their confinement or the discriminatory practices of the MDOC under the ELCRA, while they are incarcerated or after their release, and whether their claims are meritorious or not. The amendment does not, like the PLRA amendments, essentially place prisoners in the same position with respect to filing suit as other citizens. Rather, the amendment forecloses the vindication of prisoners' equal protection rights under Michigan law.

Viewing the statute in the context of this case, the ELCRA amendment essentially permits the state to discriminate against female prisoners without fear of accountability under Michigan's civil rights law. Given the state's abhorrent and well-documented history of sexual and other abuse of female prisoners, the court finds this amendment particularly troubling. It appears that the state legislature has not attempted to deter frivolous lawsuits, but rather preclude meritorious ones.

Moreover, while deterring frivolous suits and protecting the public treasury are legitimate government interests, the ELCRA amendment is too broad to be rationally related to these interests. The ELCRA amendment denies prisoners the basic protections against discrimination that all others are afforded under Michigan law, *as required by* Article I, Section Two of the Michigan Constitution, which provides that "The legislature shall implement this section by appropriate legislation." There is no rational basis for denying *all* prisoners (including those who have been released)-and no one else-the ability to seek redress for illegal discrimination that occurred in prison. As the *Romer* court explained, "[a] law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense."

Amendment does not preclude prisoners from asking the government for protection from discrimination. It only prohibits prisoners from filing a lawsuit under the ELCRA and seeking damages.

-11-

Accordingly, the court concludes that the ELCRA amendment violates prisoners' equal protection rights and is unconstitutional. [Internal citations and quotation marks omitted.]

On appeal, both parties contest the effect *Mason* should have on this case and this Court. For the following reasons, we conclude that *Mason* is not binding.

## B. FEDERAL COURT DECISIONS

"Although state courts are bound by the decisions of the United States Supreme Court construing federal law, there is no similar obligation with respect to decisions of the lower federal courts." *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004) (internal citation omitted). In other words, while "lower federal court decisions may be persuasive, they are not binding on state courts." *Id.* at 607. Thus, we reject any argument that we are required to find that the 1999 amendment to the ELCRA violates equal protection simply because a federal district judge in a limited, unpublished opinion came to that conclusion.

Plaintiffs nevertheless argue that a statute declared unconstitutional is *void ab initio*. *Stranton v Lloyd Hammond Produce Farms*, 400 Mich 135, 144; 235 NW2d 114 (1977). See also *Norton v Shelby Co*, 118 US 425, 442; 6 S Ct 1121; 30 L Ed 178 (1886) ("An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."). Relying on this rule, plaintiffs contend that because the 1999 amendment was declared unconstitutional in *Mason*, it cannot be enforced against them. However, plaintiffs fail to recognize that the courts of this state have equal responsibility to protect litigants' constitutional rights, *Steffel v Thompson*, 415 US 452, 460-461; 94 S Ct 1209; 39 L Ed 2d 505 (1974), and that state courts are not bound by decisions of lower federal courts, *Johnson v Williams*, ___ US ___; 133 S Ct 1088, 1098; 185 L Ed 2d 105 (2013); *Abela*, 469 Mich at 606.[8]

## C. PRECLUSION

## 1. BACKGROUND LAW

Plaintiffs next contend that even if the federal district court opinion in *Mason* was not binding, *per se*, the court's determination nevertheless has preclusive effect on defendants because of collateral estoppel.[9] "The preclusive effect of a federal-court judgment is determined

---

[8] Although plaintiffs rely on *Dascola v Ann Arbor*, F Supp 3d 736 (ED Mich, 2014), that case is inapposite. In *Dascola*, the issue was not whether the previous federal ruling prevented the defendants from arguing, in state court, that the statute was constitutional.

[9] We find no merit to defendants' initial argument that the Sixth Circuit in *Mason* held that the federal district court's decision had no preclusive effect in subsequent lawsuits. The issue before the Sixth Circuit in that matter was whether the defendants were entitled, at that point in time, to appeal the federal district court's decision. It viewed and rejected the defendants' argument that

-12-

by federal common law." *Taylor v Sturgell*, 553 US 880, 891; 128 S Ct 2161; 171 L Ed 2d 155 (2008). See also *Pierson Sand & Gravel, Inc v Keeler Brass Co*, 460 Mich 372, 380-381; 596 NW2d 153 (1999) ("The state courts must apply federal claim-preclusion law in determining the preclusive effect of a prior federal judgment." (Quotation omitted)). "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v McCurry*, 449 US 90, 94; 101 S Ct 411; 66 L Ed 2d 308 (1980).

The application of collateral estoppel is conditioned on the fulfillment of four requirements:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding. [*Hamilton's Bogarts, Inc v Michigan*, 501 F3d 644, 650 (CA 6, 2007) (quotation omitted).]

Although mutuality originally was a requirement, federal courts have "allowed a litigant who was not a party to a federal case to use collateral estoppel 'offensively' in a new federal suit against the party who lost on the decided issue in the first case[.]" But one general limitation the Court has repeatedly recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." *Allen*, 449 US at 94-95. See also *Perez v Aetna Life Ins Co*, 96 F3d 813, 820 (CA 6, 1996); *Laborers' Pension Trust Fund Detroit & Vicinity v Lange*, 825 F Supp 171, 175-176 (ED Mich, 1993); *In re Air Crash at Detroit Metro Airport, Detroit, Mich on Aug 16, 1987*, 776 F Supp 316, 322 (ED Mich, 1991).

In the present case, plaintiffs seek to use offensive collateral estoppel, which occurs when "a plaintiff [seeks] to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff." *Parklane Hosiery Co, Inc v Shore*, 439 US 322, 329; 99 S Ct 645; 58 L Ed 2d 552 (1979). Trial courts have broad discretion to determine whether to permit the use of offensive collateral estoppel. *Id.* at 331. "The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Id.*

## 2. UNMIXED QUESTIONS OF LAW

---

the *Mason* decision "permanently enjoins the State Defendants from raising a valid defense to this lawsuit and in subsequent lawsuits" in light of the standards for granting an interlocutory appeal.

Defendants contend that the exception to collateral estoppel for "unmixed questions of law in successive actions involving substantially unrelated claims" applies in this case. *Montana v United States*, 440 US 147, 162; 99 S Ct 970; 59 L Ed 2d 210 (1979).[10]

The United States Supreme Court has explained the exception as the following:

> Where, for example, a court in deciding a case has enunciated a rule of law, the parties in a subsequent action *upon a different demand* are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases. But a *fact, question* or *right* distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law.

> Thus, when issues of law arise in successive actions involving unrelated subject matter, preclusion may be inappropriate. [*Id.* (emphasis in original; quotation marks and citation omitted).

Further, "[t]his exception is of particular importance in constitutional adjudication. Unreflective invocation of collateral estoppel against parties with an ongoing interest in constitutional issues could freeze doctrine in areas of the law where responsiveness to changing patterns of conduct or social mores is critical." *Id.* at 162-163.

But, plaintiffs argue that this exception does not apply here because rather than an "unrelated subject matter," the subject matter in *Mason* and the present case is identical. We agree that the legal issue is identical, although due to the scarcity of facts presented in the *Mason* decision, it is difficult to discern the degree of factual similarity in the two cases. While one difference appears to be that the prisoners in *Mason* were females, as the Court explained in *United States v Stauffer Chem Co*, 464 US 165, 172; 104 S Ct 575; 78 L Ed 2d 388 (1984), factual differences must be of legal significance. Any factual differences between *Mason* and the present case do not appear to be legally significant regarding whether the 1999 amendment is constitutional.

---

[10] Defendants also raise several unpersuasive reasons for why collateral estoppel is not applicable in this case. For example, they contend that the defendants in *Mason* lacked incentive to litigate the constitutionality of the 1999 amendment. According to the United States Supreme Court, "[i]f a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeble." *Parklane*, 439 US at 330. Yet, in seeking a stay from the district court's order, defendants argued that an untold number of lawsuits would result. Thus, defendants appeared cognizant of the stakes in *Mason*. Moreover, most of defendants' arguments rest on their attempt to characterize this as an issue regarding the authority of state courts to decide issues. That is a different issue than collateral estoppel; collateral estoppel is concerned with whether a party should have a second chance to litigate an issue. See *Parklane Hosiery Co*, 439 US at 326-327.

However, in *Pharmaceutical Care Mgt Ass'n v District of Columbia*, 522 F3d 443, 446; 380 US App DC 418 (2008), the court observed that "[l]ess is required for the exception to apply in a case of non-mutual estoppel—such as this case." The court explained that "[i]n a non-mutual case, an issue is *not* precluded if it is one of law and treating it as conclusively determined would inappropriately foreclose opportunities for obtaining reconsideration of the legal rule upon which it was based." *Id.* at 446-447 (quotation marks and citation omitted). The federal court explained that applying collateral estoppel in such an instance would "freeze the development of the law in an area of substantial public interest." *Id.* at 447.

We find this reasoning to be persuasive. The issue of whether prisoners can sue for relief under the ELCRA, which is a pure legal question, is one of substantial public interest. It also requires courts to venture into the hallowed domain of constitutional law. Applying collateral estoppel in the present case, because one federal district court—in an unpublished case—ruled that the 1999 amendment was unconstitutional, would freeze this area of law prematurely and improperly.

## 3. STATE AS A PARTY

Also relevant is that defendants are state actors. In *United States v Mendoza*, 464 US 154, 158, 162; 104 S Ct 568; 78 L Ed 2d 379 (1984), the United States Supreme Court held that nonmutual offensive collateral estoppel cannot be used against the federal government. It explained its reasoning as follows:

> We have long recognized that the Government is not in a position identical to that of a private litigant, both because of the geographic breadth of government litigation and also, most importantly, because of the nature of the issues the government litigates. It is not open to serious dispute that the government is a party to a far greater number of cases on a nationwide basis than even the most litigious private entity[.] . . . Government litigation frequently involves legal questions of substantial public importance; indeed, because the proscriptions of the United States Constitution are so generally directed at governmental action, many constitutional questions can arise only in the context of litigation to which the government is a party. Because of those facts the government is more likely than any private party to be involved in lawsuits against different parties which nonetheless involve the same legal issues.

> A rule allowing nonmutual collateral estoppel against the government in such cases would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue. Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari. Indeed, if nonmutual estoppel were routinely applied against the government, this Court would have to revise its practice of waiting for a conflict to develop before granting the government's petitions for certiorari.

The Solicitor General's policy for determining when to appeal an adverse decision would also require substantial revision. The Court of Appeals faulted the government in this case for failing to appeal a decision that it now contends is erroneous. But the government's litigation conduct in a case is apt to differ from that of a private litigant. Unlike a private litigant who generally does not forego an appeal if he believes that he can prevail, the Solicitor General considers a variety of factors, such as the limited resources of the government and the crowded dockets of the courts, before authorizing an appeal. The application of nonmutual estoppel against the government would force the Solicitor General to abandon those prudential concerns and to appeal every adverse decision in order to avoid foreclosing further review.

In addition to those institutional concerns traditionally considered by the Solicitor General, the panoply of important public issues raised in governmental litigation may quite properly lead successive Administrations of the Executive Branch to take differing positions with respect to the resolution of a particular issue. While the Executive Branch must of course defer to the Judicial Branch for final resolution of questions of constitutional law, the former nonetheless controls the progress of government litigation through the federal courts. It would be idle to pretend that the conduct of government litigation in all its myriad features, from the decision to file a complaint in the United States District Court to the decision to petition for certiorari to review a judgment of the Court of Appeals, is a wholly mechanical procedure which involves no policy choices whatever. [*Id.* at 159-161.]

Defendants reason that, as nonmutual offensive collateral estoppel cannot be used against the federal government, it likewise should not be applied against state governments. Although some federal circuits have found that states are unlike the federal government, and therefore the reasoning of *Mendoza* does not apply, see *Benjamin v Coughlin*, 905 F2d 571, 576 (CA 2, 1990), we disagree. Instead, we find federal cases applying this rule to state courts to be more persuasive and, thus, we will follow them.

For example, in *Hercules Carriers, Inc v Claimant State of Florida, Dep't of Transp*, 768 F2d 1558, 1579 (CA 11, 1985), the Eleventh Circuit held "that the rationale outlined by the Supreme Court in *Mendoza* for not applying nonmutual collateral estoppel against the government is equally applicable to state governments." The court reasoned that *Mendoza* did not differentiate between the interests of the federal government and state government, nor was there anything in *Mendoza* to suggest that the concerns expressed by the court were peculiar to the federal government. *Id.*[11] Likewise, in *State of Idaho Potato Comm v G&T Terminal*

---

[11] Although plaintiffs focus on the fact that the court in *Hercules* noted that the case involved different state agencies, that was only one additional reason the court provided. Further, we note that all the defendants in this case do not appear to be identical to all of the defendants in *Mason*.

*Packaging, Inc*, 425 F3d 708, 714 (CA 9, 2005), the Ninth Circuit held that the rationale in *Mendoza* applied to state governments.[12]

Like the federal government, state governments are subject to suit at a frequency that even the most litigious private entity does not come close to reaching. Further, government litigation frequently involves legal questions of substantial public importance, such as in this case. We also agree that, because of differences between a state government and private litigants, applying nonmutual collateral estoppel against a state government would thwart the development of important questions of law. It would freeze as final the first decision rendered on a particular legal question, most times prematurely. *Mendoza*, 464 US at 106. That is especially so in this case, as plaintiffs are attempting to offensively apply nonmutual collateral estoppel from an unpublished, limited federal district court case to the matter before us. This application of collateral estoppel would prematurely prevent future courts from exploring these complex and important legal issues as they would be perpetually frozen in time.

Accordingly, defendants are not precluded, based on *Mason,* from arguing that the 1999 amendment to the ELCRA is constitutional.

## V.  EQUAL PROTECTION

## A.  BACKGROUND LAW

Because *Mason* is not binding on us or defendants, we next address whether the 1999 amendment to the ELCRA is facially unconstitutional as violative of equal protection.

Under the United States Constitution, no state shall "deny to any person within its jurisdiction the equal protection of the laws." US Const, Am XIV. The Michigan Constitution provides:

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. [Const 1963, art 1, § 2.]

The Equal Protection Clause in the Michigan Constitution is coextensive with the Equal Protection Clause in the United States Constitution. *Shepherd Montessori Ctr Milan v Ann*

---

[12] See also *Chambers v Ohio Dep't of Human Servs*, 145 F3d 793, 801 n 14 (CA 6, 1998), wherein the Sixth Circuit opined, in the context of Ohio law, that "[a]lthough the *Mendoza* rationale has not been definitively extended to apply to state governments, there is support for that proposition. The same considerations set forth in *Mendoza* with respect to the federal government may apply to state governments." (Internal citations omitted). The Sixth Circuit concluded that "[w]hile Ohio law is silent in this respect, given its restrictive views on mutuality, we anticipate that the Ohio Supreme Court would not use offensive non-mutual issue preclusion against the state." *Id.*

*Arbor Charter Twp*, 486 Mich 311, 318; 783 NW2d 695 (2010). "[T]he constitutional demand is not a demand that a statute necessarily apply equally to all persons." *Rinaldi v Yeager*, 384 US 305, 309; 86 S Ct 1497; 16 L Ed 2d (1966). "While the Equal Protection Clause ensures that people similarly situated will be treated alike, it does not guarantee that people in different circumstances will be treated the same." *In re Parole of Hill*, 298 Mich App 404, 420; 827 NW2d 407 (2012) (quotation marks and citation omitted). The threshold inquiry is whether the plaintiff was treated differently from a similarly situated entity. *Shepherd Montessori Ctr Milan*, 486 Mich at 318. Further,

> [t]o determine whether a legislative classification violates equal protection, the reviewing court applies one of three tests. If the legislation creates an inherently suspect classification or affects a fundamental interest, the "strict scrutiny" test applies. Other classifications that are suspect but not inherently suspect are subject to the "substantial relationship" test. However, social and economic legislation is generally examined under the traditional "rational basis" test. [*Zdrojewski v Murphy*, 254 Mich App 50, 79; 657 NW2d 721 (2002) (citations omtted).]

It is well established that "prisoners" are not a suspect class. See *People v Groff*, 204 Mich App 727, 731; 516 NW2d 532 (1994). Plaintiffs' argument that the 1999 amendment "stripped all and only prisoners of any of ELCRA's remedies for unquestionably unconstitutional discrimination based on age, [disability,] race, and gender" is not availing. Importantly, the classification in the 1999 amendment at issue is based on a person's status as a *prisoner*, not based on any of the suspect classifications of age, disability, race, or gender. In other words, the 1999 amendment applies to *all* prisoners, including males and females, the youth and aged, the abled and disabled, and individuals of all different races. Those suspect classifications simply are not the dividing lines in this case.

Furthermore, plaintiffs have not sufficiently alleged that the 1999 ELCRA amendment itself infringes upon a protected, fundamental right. Any right implicated emanates from the statute, which declares that

> [t]he opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, *public service*, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, height, weight, familial status, or marital status . . . is recognized and declared to be a civil right." [MCL 37.2102(1) (emphasis added).]

Plaintiffs cite to no authority that limits the Legislature's authority to define what constitutes (or does not constitute) a "public service" under the ELCRA. There is nothing in the constitutional mandate regarding public accommodation or public service. Since the Legislature created these civil rights,[13] it naturally follows that it can define the scope of them. See *Beech*

---

[13] We note that these legislatively created rights are more expansive than the constitutionally protected rights under Const 1963, art 1, § 2, which only covers discrimination on the basis of

-18-

*Grove Inv Co v Civil Rights Comm*, 380 Mich 405, 426; 157 NW2d 213 (1968), quoting Roger C Cramton, *The Powers of the Michigan Civil Rights Commission*, 63 Mich L Rev 5, 9 (1964) (noting that civil rights were not specifically defined in the Constitution and that the Legislature was to "define their scope, limits, and sanctions.").

The fact that this Court has determined that the pre-1999 amendment term "public service" includes prisons does not stand for the proposition that the Legislature could never alter the definition thereafter. See *Doe v Dep't of Corrections*, 240 Mich App 199, 201; 611 NW2d 1 (2000) ("If it is the intent of the Legislature not to have these statutes applied to prisoners and prisons, then it is incumbent on the Legislature to draft and enact statues that so provide."). Indeed, because of the fact that prisons are not "open to the public," their exclusion as a place of "public service" is reasonable. See *id.* at 206-207 (GRIBBS, J., dissenting) (noting that prisons are not established to provide services *to* the public).

Consequently, because no suspect class --based upon age, disability, race, or gender-- is being singled out and no fundamental right is being affected, we apply the rational basis test to determine whether the 1999 amendment violates equal protection.[14] "Under the rational basis test, legislation is presumed to be constitutional and will survive review if the classification scheme is rationally related to a legitimate governmental purpose." *Zdrojewski*, 254 Mich App at 80. Further, "the burden of showing a statute to be unconstitutional is on the challenging party, *not* on the party defending the statute." *Shepherd Montessori Ctr Milan*, 486 Mich at 319 (emphasis in original; quotation marks and citation omitted). Thus, "[t]o prevail under this highly deferential standard of review, a challenger must show that the legislation is arbitrary and wholly unrelated in a rational way to the objective of the statute." *Harvey v State, Dep't of Management & Budget, Bureau of Retirement Servs*, 469 Mich 1, 7; 664 NW2d 767 (2003) (quotation marks and citation omitted). A classification reviewed under rational basis survives if the legislative judgment is supported by any set of facts, either known or which could reasonably be assumed, even if such facts are debatable. *Id.* As our Supreme Court has cautioned, rational basis review does not test the need, wisdom, or appropriateness of the legislation, nor whether the classification is made with mathematical nicety or whether it results in some inequity in practice. *Id.* Rather, the statute is presumed constitutional, and the challenger bears a heavy burden of rebutting this presumption. *Id.*

## B. SIMILARLY SITUATED

Our Supreme Court has advised that, when reviewing an equal protection challenge to state legislation, the threshold inquiry is whether the plaintiff was treated differently from a similarly situated class of individuals. *Shepherd Montessori Ctr Milan*, 486 Mich at 318. Defendants contend that prisoners are not similarly situated to nonprisoners. Plaintiffs make no claim that prisoners are similarly situated to nonprisoners. Instead, they assert that a similarly situated analysis is not applicable because that inquiry only applies to "class of one" claims.

"religion, race, color or national origin." In fact, because plaintiffs' claims allege discrimination on the basis of sex, it is clear that the constitutional rights are not implicated.

[14] Although plaintiffs cite to *Romer* and contend that heightened scrutiny should apply, the Court in *Romer* applied rational basis. *Romer*, 517 US at 632-635.

-19-

However, even in cases that do not involve class of one claims, we have recognized that equal protection requires only equal treatment for those who are similarly situated. See *Schmude Oil, Inc v Dep't of Environmental Quality*, 306 Mich App 35, 55; 856 NW2d 84 (2014); *Brinkley v Brinkley*, 277 Mich App 23, 35; 742 NW2d 629 (2007); *Crego v Coleman*, 463 Mich 248, 258; 615 NW2d 218 (2000). Moreover, "[t]o be considered similarly situated, the challenger and his comparators must be *prima facie* identical in all relevant respects or directly comparable . . . in all material respects." *Demski v Petlick*, __ Mich App __; __NW2d __ (Docket No. 322193, issued March 5, 2015) (quotation marks and citation omitted); slip op at 30; *Schmude Oil, Inc*, 306 Mich App at 55 (quotation marks and citation omitted).

Prisoners and nonprisoners are not similarly situated in the relevant respects in this case. The most obvious difference is that prisoners lack liberty when receiving what plaintiffs argue are public services. Prisoners are not receiving services from prisons as a result of an invitation or a voluntary arrangement. Very few, if any, voluntarily avail themselves of residency in a correctional facility. Rather, they are compelled to be there, and must be content, for the most part, with the services provided. See *Brown v Genesee Co Bd of Comm'rs (After Remand)*, 464 Mich 430, 439; 628 NW2d 471 (2001) (opinion of CORRIGAN, J.) ("an inmate does not visit a jail as a potential invitee. Instead, inmates are *legally compelled* to be there[.]") (Emphasis in original). Thus, they are not receiving these alleged public services as some type of benefit but instead as a necessary corollary of the punishment to which a court has sentenced them. Further, while receiving these services, prisoners are not in the same position as the general public, as many of their fundamental rights are severely curtailed. See *Samson v California*, 547 US 843, 848; 126 S Ct 2193; 165 L Ed 2d 250 (2006); *Hudson v Palmer*, 468 US 517, 525-526; 104 S Ct 3194; 82 L Ed 2d 393 (1984). See also *People v Maxson*, 181 Mich App 133, 135; 449 NW2d 422 (1989) (stating that "inmates and ordinary citizens are not similarly situated" in the context of prosecutions for possession of metallic knuckles).[15]

Therefore, especially in light of the fact that plaintiffs fail to offer a cognizable argument that prisoners are similarly situated to nonprisoners, we find there is no genuine issue of material fact regarding prisoners being similarly situated, i.e., identical in all relevant respects or directly comparable in all material respects, to nonprisoners. *Demski*, __ Mich App at__; slip op at 30.[16]

## C. RATIONAL BASIS

---

[15] In various other contexts, courts have found that prisoners and nonprisoners are not similarly situated. See *Smith v Corcoran*, 61 F Appx 919 (CA 5, 2003); *Roller v Gunn*, 107 F3d 227, 234 (CA 4, 1997); *Scher v Chief Postal Inspector*, 973 F2d 682, 683-684 (CA 8, 1992); *Hrbek v Farrier*, 787 F2d 414, 417 (CA 8, 1986); *Niemic v UMass Corr Health*, __ F Supp 3d __ (D Mass, 2015); *Pratt v GEO Group, Inc*, 802 F Supp 2d 1269, 1272 (WD Okla, 2011); *Hertz v Carothers*, 174 P3d 243, 248 (Alas, 2008); *McGuire v Ameritech Servs, Inc*, 253 F Supp 2d 988, 1001 (SD Ohio, 2003); *Rudolph v Cuomo*, 916 F Supp 1308, 1323 (SD NY, 1996).

[16] Because we agree that prisoners are not similarly situated, we decline to address defendants' alternate arguments regarding this issue.

However, even if we were to find that prisoners are similarly situated to nonprisoners, or even if we were not required to engage in such an analysis, plaintiffs' claim still fails because plaintiffs have failed to show how the 1999 amendment was not rationally related to a legitimate governmental interest.

Defendants offer several purposes behind the 1999 amendment, the first being prison order and management. Generally, it is true that the maintenance of order in a prison is an essential goal that could require limiting or retracting the rights of a prisoner. *Bell v Wolfish*, 441 US 520, 546; 99 S Ct 1861; 60 L Ed 2d 447 (1979). But, we fail to see how prohibiting prisoners from suing for damages for discrimination under the ELCRA serves the purpose of maintaining prison order. Accordingly, we conclude that this purpose is not rationally related to a legitimate governmental interest.

However, the second purpose defendants offer is the deterrence of meritless lawsuits and the preservation of scarce resources through the reduction of costs associated with resolving those lawsuits. Several courts have already recognized that the preservation of scarce governmental resources from frivolous prisoner actions is a legitimate government interest.

In *Proctor v White Lake Twp Police Dep't*, 248 Mich App 457; 639 NW2d 332 (2001), the plaintiff argued that the provisions under the Freedom of Information Act (FOIA), MCL 15.231 *et seq.*, which excluded incarcerated prisoners from obtaining public records, violated equal protection. *Id.* at 468. This Court disagreed. *Id.* at 469-470. We found "that the Legislature's FOIA exclusions singling out incarcerated prisoners rationally relate to the Legislature's legitimate interest in conserving the scarce governmental resources squandered responding to frivolous FOIA requests by incarcerated prisoners." *Id.* at 469.

In *Morales v Mich Parole Bd*, 260 Mich App 29; 676 NW2d 221 (2003), the plaintiff argued that MCL 791.234, which precluded prisoners from appealing the decision of a parole board, violated equal protection. However, we found that the exclusion was "rationally related to the Legislature's legitimate interest in saving public funds in response to innumerable frivolous requests by incarcerated prisoners for the review of the Parole Board's denials of parole. We recognize the government's legitimate interest in conserving the scarce governmental resources[.]" *Id.* at 52.

In cases involving the federal PLRA, the deterrence of meritless lawsuits likewise has been recognized as a legitimate governmental interest. In *Hampton v Hobbs*, 106 F3d 1281, 1281 (CA 6, 1997), the plaintiff argued that the fee requirements of the federal PLRA, which required all prisoners to pay an initial filing fee, violated equal protection. The Sixth Circuit found that "[d]eterring frivolous prisoner filings in the federal courts falls within the realm of Congress's legitimate interests, and the specific provisions in question are rationally related to the achievement of that interest." *Id.* at 1287.

In *Hadix v Johnson*, 230 F3d 840, 840 (CA 6, 2000), the plaintiff argued that the attorney fee cap provision in the federal PLRA violated equal protection. The Sixth Circuit disagreed, finding that the "cap does appear to be rationally related to the very similar goal of decreasing marginal or trivial lawsuits." *Id.* at 845-846. The court explained that "in lowering the fee recoverable if the claim succeeds, attorneys are likely to demand a more meritorious claim to

make the representation worthwhile." *Id.* at 845. The Sixth Circuit also found that Congress, by reducing marginal or frivolous lawsuits, "could also rationally be seeking to protect the state and federal treasuries, from which the majority of prisoner civil rights awards are paid." *Id.*

In *Walker v Bain*, 257 F3d 660, 669 (CA 6, 2001), the Sixth Circuit found that the PLRA's cap on the defendants' liability for attorney fees did not violate equal protection. Like *Haddix*, the court found the "twin goals of decreasing marginal lawsuits and protecting the public fisc are legitimate government interests, and that decreasing an attorney fee award in the context of prisoner civil rights litigation serves both of these interests." *Id.*

As the foregoing cases indicate, it is well established that deterring frivolous prisoner lawsuits furthers a legitimate governmental interest. Not only can the Legislature impose limits on how prisoners interact with the courts, it can wholly preclude them from filing certain claims. See *Proctor*, 248 Mich App at 469-470. Even if defendants did not provide any evidence that prisoners have a history of excess filings of frivolous discrimination claims, this fact does not make the 1999 amendment invalid. That is because legislation subject to rational basis review "passes constitutional muster if the legislative judgment is supported by any set of facts, either known or which could reasonably be assumed, even if such facts may be debatable." *Harvey*, 469 Mich at 7 (quotation marks and citation omitted). Thus, the Legislature could reasonably assume that prisoners frequently file frivolous lawsuits in general. Scarce resources are preserved when fewer lawsuits are filed against correctional facilities and prison officials. And even though prisoners with meritorious claims of discrimination are precluded by virtue of the 1999 amendment, under the rational basis test, courts do not inquire into whether the legislation results in some inequity. *Id.* Nor do we test the need, wisdom, or appropriateness of the legislation. *Id.* Rather, we remain vigilant in our limited role, which is to presume that the statute is constitutional and to hold the challenger to its heavy burden of rebutting this presumption. *Id.*

Because the 1999 amendment is rationally related to the legitimate interests of deterring frivolous lawsuits and preserving scarce public resources, we hold that the amendment passes the rational basis test and is constitutional. Accordingly, defendants were entitled to summary disposition because, with the state correctional facilities in this case not being areas of "public service" under the ELCRA, plaintiffs have failed to state a claim on which relief could be granted. MCR 2.116(C)(8).

Therefore, the trial court erred in denying defendants' motion for summary disposition on this ground. Because our analysis disposes of the lawsuit, we decline to address defendants' alternate arguments regarding plaintiffs' failure to state a claim.[17]

In essence, plaintiffs' suit here is about whether prisoners can seek a remedy under the ELCRA. We do not pass judgment on the validity of the underlying claims of this lawsuit. Although the ELCRA may not be among the avenues through which plaintiffs can seek monetary

---

[17] Because we agree that prisoners are not similarly situated, we decline to address defendants' alternate arguments regarding this issue.

redress for their alleged injuries, as discussed *supra*, this fact alone does not render the statute unconstitutional, nor does it preclude plaintiffs from pursuing remedies available to them through other legal avenues.

Plaintiffs' claim that each of them was sexually assaulted while in a correctional facility would, if proven, amount to extremely egregious and reprehensible conduct by defendants. But, this case concerns only plaintiffs' ability to sue for damages under the ELCRA, as opposed to addressing their grievances pursuant to other civil or constitutional remedies that may exist.[18]

In fact, plaintiffs already have initiated a companion case in a federal court action under 42 USC § 1983. In addition, plaintiffs could again choose to seek relief under the PLRA. Additionally, they could seek injunctive relief pursuant to a constitutional action, or initiate individual tort claims. *Sharp v Lansing*, 464 Mich 792, 801; 629 NW2d 873 (2001). Thus, while prisoner lawsuits relating to correctional facilities as places of public service are precluded under the ELCRA, plaintiffs' inability to sue under this statute does not preclude them from seeking redress for the serious wrongs they are alleging through any other avenues that may be available to them.[19] Nor are plaintiffs, or others, precluded from seeking a legislative change to the ELCRA to allow prisoner public service lawsuits under the statute.[20]

## VI. CONCLUSION

In Docket No. 321013, we agree with defendants that the trial court erred in failing to grant them summary disposition regarding plaintiffs' failure to comply with the disclosure requirements of MCL 600.5507. In Docket No. 321756, we likewise agree with defendants that the trial court erred in failing to grant them summary disposition regarding plaintiffs' claims under the ELCRA. We have reviewed all remaining issues and find them to be without merit or

---

[18] Although plaintiff's allegations relate to the fundamental right to be free from sexual assault, as discussed *supra*, at its essence, the matter before us is about the right of prisoners to sue for money damages under the ELCRA. Furthermore, the right to be free from sexual assault rests in substantive due process, and plaintiffs have asserted only an equal protection challenge to the 1999 amendment. *Doe v Claiborne Co, Tenn By & Through Claiborne Co Bd of Ed*, 103 F3d 495, 506 (CA 6, 1996). See also *Albright v Oliver*, 510 US 266, 272; 114 S Ct 807; 127 L Ed 2d 114 (1994); *Ingraham v Wright*, 430 US 651, 673; 97 S Ct 1401; 51 L Ed 2d 711 (1977); *Union Pacific R Co v Botsford*, 141 US 250, 251; 11 S Ct 1000; 35 L Ed 734 (1891).

[19] In their briefing, plaintiffs refer to their fundamental right to access the courts. However, in light of the many actions plaintiffs remain free to assert, their right to access to the courts is not foreclosed by our decision in this matter. See *Michigan Deferred Presentment Services Ass'n v Comm'r of Office of Fin & Ins Regulation*, 287 Mich App 326, 336; 788 NW2d 842 (2010); *Stevenson v Reese*, 239 Mich App 513, 518-519; 609 NW2d 195 (2000); *American States Ins Co v State Dep't of Treasury*, 220 Mich App 586, 595-596; 560 NW2d 644 (1996).

[20] While the dissent claims that plaintiffs would be hard pressed to find attorneys to represent them if they are not permitted to sue under the ELCRA, that conclusion is purely speculative and not based on anything in the record before us.

unnecessary for the disposition of this appeal.  We reverse and remand for entry of summary disposition in favor of defendants.  We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Pat M. Donofrio